UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HAZEL PARK RACING ASSOCIATION,
INC., a Michigan corporation, NORTHVILLE
RACING CORPORATION, a Michigan
corporation, and NORTHVILLE DOWNS
HALFMILE CYCLE RACE CORPORATION,
a Michigan corporation,

    Plaintiffs,

                                        Case No. 07-11578

-vs-                                      Judge Avern Cohn

TRUSTEES OF THE SEIU NATIONAL
INDUSTRY PENSION FUND,

    Defendant.

_____/


**MEMORANDUM AND ORDER
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

This is a case brought under the Employee Retirement Income Security Act ("ERISA"). The plaintiffs, Hazel Park Racing Association, Inc.; Northville Downs Halfmile Cycle Race Corporation; and Northville Racing Corporation are employers that operate horse racing tracks in southeastern Michigan. The defendants are trustees of the Service Employees International Union National Industry Pension Fund ("the SEIU Fund"), a multiemployer defined-benefit pension fund. The plaintiffs were contributing

1

employers to the SEIU Fund until the local chapter of SEIU disclaimed representation of plaintiffs' employees in February 2003.  Representation of the bargaining unit was transferred to Teamsters Local No. 337, and as a consequence the plaintiffs began contributing to a different multiemployer pension fund, the Central States Southeast and Southwest Areas Pension Fund ("the Central States Fund").

The issue in this case is whether, as a result of the changes described above, the SEIU Fund was obligated to transfer assets and liabilities associated with plaintiffs' employees to the Central States Fund.  Plaintiffs say that the SEIU Fund was required to transfer these assets and liabilities pursuant to 29 U.S.C. § 1415, but failed to do so; as a result, the SEIU Fund assessed "withdrawal liability" against plaintiffs that was much higher than it otherwise would have been.  Withdrawal liability represents the employer's share of a pension plan's unfunded vested benefits.  Plaintiffs seek damages in the amount of the increase in withdrawal liability assessments plus ancillary costs.  Defendants deny that they were required to transfer the relevant assets and liabilities under § 1415, because the plaintiffs' withdrawal as contributing employers from the SEIU Fund did not result from a "certified change of collective bargaining representative."

Before the Court are three motions: defendants' motion to dismiss the complaint for failure to state a valid claim and the parties' cross-motions for summary judgment. The central issue with respect to each motion is whether § 1415 should be construed to require a pension fund to transfer attendant assets and liabilities after a change in bargaining representation that is voluntarily recognized by the employer rather than being formally "certified" by the National Labor Relations Board ("NLRB").  This is

2

apparently an issue of first impression. For the reasons that follow, defendants' motion for summary judgment will be granted.

## II. Facts

The following are the facts as gleaned from the record. Although there are some minor factual disputes, none bear on the proper construction of § 1415 in this case.

The plaintiffs were contributing employers to the SEIU Fund for a period of time leading up to February 2003, when SEIU Local No. 79 disclaimed representation of plaintiffs' employees. By letter dated March 28, 2003, the plaintiffs notified the SEIU Fund that SEIU Local No. 79 no longer represented their employees and that there was no basis for employer contributions to the SEIU Fund after February 1, 2003. Monthly pension contributions previously made to the SEIU Fund were put into escrow until a new agreement governing pension contributions was established.

Representation of the bargaining units was subsequently transferred to Teamsters Local No. 337. This change was not approved by the NLRB, since the NLRB declines to exercise jurisdiction over the horse racing industry. 29 C.F.R. § 103.3. The Michigan Employment Relations Commission ("MERC") regulates collective bargaining in the Michigan horse racing industry. There is no evidence in the record to suggest that the change in bargaining representation here was formally certified by the MERC. Rather, the change was voluntarily recognized by the plaintiffs, obviating any need for formal approval.

Effective August 1, 2003, plaintiffs and Teamsters Local No. 337 entered into a collective bargaining agreement whereby the plaintiffs were obligated to contribute to the Central States Fund on behalf of employees represented by the Teamsters.

On December 28, 2004, the SEIU Fund notified each plaintiff that it had completely withdrawn from the SEIU pension plan as of February 1, 2003, and that it had incurred a "withdrawal liability assessment." The liability was assessed in the following amounts: Hazel Park – $1,985,541.32; Northville Downs – $436,001.68; Northville Racing – $262,459.22.

SEIU denies that it is required to make any transfer of assets and liabilities associated with plaintiffs' employees to the Central States Fund under 29 U.S.C. § 1415 and has not done so. Plaintiffs and defendants jointly commissioned an actuarial study to determine how the plaintiffs' withdrawal liability would be affected if the SEIU Fund had transferred the relevant assets and liabilities to the Central States Fund. The parties agree that had the transfer been made, withdrawal liability would have been reduced in the following amounts: Hazel Park – $1,970,288.00 (resulting in approximately $15,000 of total withdrawal liability); Northville Downs – $758,459.00 (resulting in no withdrawal liability); Northville Racing – $183,121.00 (resulting in approximately $80,000 of withdrawal liability).

### III. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

Where a motion for dismissal under Fed. R. Civ. P. 12(b)(6) calls for consideration of matters outside of the pleadings, the motion may be treated as one for summary judgment.  Fed. R. Civ. P. 12(b).

## IV. Analysis

### A. 29 U.S.C. § 1415

29 U.S.C. § 1415 provides in relevant part:

> **(a) Authority to transfer from old plan to new plan pursuant to employee participation in another multiemployer plan after certified change of representative**
>
> In any case in which an employer has completely or partially withdrawn from a multiemployer plan (hereafter in this section referred to as the "old plan") as a result of certified change of collective bargaining representative occurring after September 25, 1980, if participants of the old plan who are employed by the employer will, as a result of that change, participate in another multiemployer plan (hereafter in this section referred to as the "new plan"), the old plan shall transfer assets and liabilities to the new plan in accordance with this section.
>
> ...
>
> **(g) Definitions**
>
> For purposes of this section--
>
> ...
>
> (2) "Certified change of collective bargaining representative" means a change of collective bargaining representative certified under the Labor-Management Relations Act, 1947 [29 U.S.C. A. § 141 *et seq.*], or the Railway Labor Act [45 U.S.C.A. § 151 *et seq.*]

At issue is whether the change in representation of plaintiffs' employees from SEIU Local No. 79 to Teamsters Local No. 337 amounted to a "certified change of collective bargaining representative" such that the SEIU Fund is subject to the obligation to

7

transfer assets and liabilities imposed by § 1415(a).  If the change in representation does not fit within § 1415, then defendants are entitled to summary judgment.

As noted above, the NLRB has long declined to exercise jurisdiction over labor relations the horse-racing industry, as such operations are essentially local in character and are generally subject to detailed state regulation.  See, e.g., Racing Ass'n of Central Iowa, 324 NLRB 550 (1997); 29 C.F.R. § 103.3.  Labor relations involving the plaintiffs in this case are regulated by the MERC, pursuant to the substantive provisions of a Michigan statute, the Labor Mediation Act, MCL § 423.1 *et seq*.  In this case, the MERC did not undertake a formal certification process with regard to the change in bargaining representation from SEIU to the Teamsters.  This was unnecessary because the plaintiffs voluntarily agreed to recognize the change in representation as part of their collective bargaining agreement with the Teamsters.

### 1.  Plaintiffs' Arguments

Plaintiffs argue for a broad reading of § 1415, such that formal certification by the NLRB is not necessary to trigger the obligation of the "old" pension fund (here, the SEIU Fund) to transfer the relevant assets and liabilities to the "new" pension fund (here, the Central States Fund).  They make several arguments to this general effect.  First, plaintiffs point out that the NLRB could, consistent with the National Labor Relations Act and the Commerce Clause of the U.S. Constitution, exercise jurisdiction over the horse racing industry and employers such as the plaintiffs in this case.  The NLRB's decision to decline jurisdiction in this area is discretionary.

Second, plaintiffs note that the Labor Management Relations Act ("LMRA") specifically authorizes states to regulate labor relations in areas where the NLRB has

declined in its discretion to exercise jurisdiction. 29 U.S.C. § 164(c)(2).[1] Plaintiffs further suggest that, given the strong preemptive power of the LMRA, see Int'l Ass'n of Machinists & Aero. Workers v. Wis. Employment Relations Comm'n, 427 U.S. 132 (1976), state regulation of labor relations would be preempted absent the explicit authorization of § 164(c)(2). In this sense, the MERC's authority "flows through" the LMRA, such that the change in bargaining representative might be said to have been "certified under the [LMRA]." On this point, plaintiffs also draw attention to the fact that the MERC and state courts look to analogous provisions of the LMRA and the National Labor Relations Act precedent in reaching decisions under the state Labor Mediation Act. The MERC thus makes its decisions "under" the same essential framework as the NLRB.

Next, plaintiffs suggest that on the whole, ERISA evinces a policy of encouraging transfers of pension assets and liabilities such that employee pension plans are

---

[1] 29 U.S.C. § 164(c) provides:

**Power of Board to decline jurisdiction of labor disputes; assertion of jurisdiction by State and Territorial courts**

(1) The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to subchapter II of chapter 5 of Title 5, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction: *Provided*, That the Board shall not decline to assert jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959.

(2) Nothing in this subchapter shall be deemed to prevent or bar any agency or the courts of any State or Territory (including the Commonwealth of Puerto Rico, Guam, and the Virgin Islands), from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction.

reasonably "portable."  Plaintiffs also say that there is no convincing policy reason why they should be excluded from the protections offered by § 1415(a), while similarly situated employers in sectors that are regulated by the NLRB can utilize this provision to reduce or eliminate withdrawal liability.

Plaintiffs further point out that actual certification of a change of bargaining representative by the NLRB is not required before an employer is legally obligated to bargain with a union; for example, it is sufficient that the new representative demonstrates that it has obtained authorization cards from a majority of employees in the bargaining unit and to demand recognition.  See NLRB v. Gissel Packing Co., 395 U.S. 575 (1969).  In such a case, plaintiffs urge that the change in bargaining representative is constructively "certified" by the NLRB.

Finally, plaintiffs argue that § 1415(g)(2) is ambiguous insofar as it refers to the LMRA, when the actual procedures for NLRB certification are contained in the National Labor Relations Act.

## 2.  Defendants' Arguments

Defendants place great weight upon the plain language of the statute, which requires that the change in bargaining representative be "certified under the Labor-Management Relations Act."  Neither the NLRB nor the MERC issued a formal certificate in this case.  Defendants cite Eatz v. DME Unit of Local Union No. 3 of the IBEW, 973 F.2d 64 (2d Cir. 1992), for the proposition that certifications by the MERC and analogous state agencies are decided "under" state law rather than federal law.  In Eatz, a group of employees in the horse racing industry sued their union and employer

10

for breach of the duty of fair representation imposed by the National Labor Relations Act. The Second Circuit held that, because the NLRB had declined to exercise jurisdiction, state law governed the dispute and a federal court could not exercise jurisdiction over the case.

Defendants also attempt to rebut plaintiffs' claim that the reference in § 1415(g)(2) to the LMRA and the absence of any reference to the National Labor Relations Act renders the section ambiguous. Defendants note that the relevant language in § 1415(g) was added as part of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). At the time the MPPAA was enacted, the procedures governing certification of a change in bargaining representative were governed by the National Labor Relations Act as amended by the LMRA. At that time, 29 U.S.C. § 141(a) stated that chapter 7 of that title "may be cited as the 'Labor Management Relations Act.'" Defendants conclude that the reference to the LMRA in § 1415(g)(2) unambiguously refers to chapter 7 of Title 29, comprising the National Labor Relations Act as amended by the LMRA.

Defendants also emphasize that voluntary recognition of a bargaining order does not result in "certification" by the NLRB. They point to a report by the Congressional Research Service stating that by 1939, the NLRB's policy was to certify only those unions that had been chosen by secret ballot election. This practice would have been well-established by the time the statutory provisions at issue here were enacted, lending credence to the notion that Congress meant to include only formally certified changes in bargaining representative within the sweep of § 1415(a).

### 3. Analysis

Sections 1415(a) and (g)(2) provide that only those changes in bargaining representative that are "certified under the LMRA" trigger the mandatory transfer of attendant assets and liabilities. "Certification" within the context of the LMRA and the National Labor Relations Act would certainly appear to refer to the issuance of a formal certificate by the NLRB. If Congress intended to include any *bona fide* change in bargaining representative, not necessarily including the issuance of a certificate, it could have used a broader phrase such as "approved under the LMRA." It is undisputed that no certificate was ever issued here, either by the NLRB or by the MERC.

Moreover, as the NLRB has declined to exercise jurisdiction over the plaintiffs in this case, relations with their employees' bargaining representatives are governed by the substantive provisions of the Michigan Labor Mediation Act. The LMRA does explicitly authorize states to enact statutes where the NLRB has in its discretion declined to exercise jurisdiction; however, it strains the language of the statute to say that rulings made pursuant to the substantive provisions of state law are made "under the LMRA." While the MERC looks to analogous provisions of federal law in deciding its own cases under Michigan law, there is nothing in federal law that requires it to do so. Congress "made no explicit provision as to the body of law that states were to apply in exercising their authority under [§ 164(c)]," Eatz, 973 F.2d at 67, and "the legislative context makes it reasonably clear that Congress expected the states to apply state law," id. at 67-68. Again, had Congress intended to include the sort of decisions issued by the MERC within the sweep of § 1415(a), it could have used broader language such as

"under the LMRA or state law enacted in accordance with 29 U.S.C. § 164(c)(2)." In any event, the MERC did not involve itself in the change of bargaining units at issue in this case.

Plaintiffs attempt to circumvent the plain meaning of the text by arguing that policy reasons militate strongly in favor of including them within the protections of § 1415(a). Only the very strongest policy considerations, however, are sufficient to allow a court to ignore the plain meaning of validly enacted statute. A court should do so only "where the result of applying the plain language would be, in a genuine sense, absurd, i.e., where it is quite impossible that Congress could have intended the result...and where the alleged absurdity is so clear as to be obvious to most anyone." Public Citizen v. Dept. of Justice, 449 U.S. 440, 470-71 (1989) (Kennedy, J., concurring); see also Nixon v. Miss. Mun. League, 541 U.S. 125, 141 (2004) (Scalia, J., concurring) ("avoidance of unhappy consequences" is insufficient to avoid plain meaning of text). If the meaning of a statute is plain from the language in which the act is framed, the sole function of courts is to enforce the act according to its terms.

This case does not present the sort of manifest absurdity necessary to circumvent the plain language of § 1415. The statutory provisions creating withdrawal liability and the exceptions thereto were enacted as amendments to the original ERISA statute. When ERISA was first enacted, an employer that had paid all required contributions to a multiemployer pension plan could withdraw from the plan and, so long as the plan did not terminate within five years after the withdrawal, face no further responsibility for the plan's unfunded vested benefits. ERISA thus created an

"undesirable incentive for employers to withdraw from plans and an unfair burden on the employers who continue[d] to maintain the plans." H.R. Rep. No. 96-869, Part II, 96th Cong., 2d Sess. 10, reprinted in 1980 U.S. Code Cong. & Ad. News 2993, 3001.

To eliminate this undesirable incentive and promote stability in multiemployer plans, Congress enacted the MPPAA, the most important feature of which was the creation of withdrawal liability. The withdrawal liability provisions of the MPPAA ratably allocated unfunded vested benefits to withdrawing employers by calculating their fair share of the liability on the date of withdrawal. Withdrawal liability therefore "reduces an employer's incentive to withdraw from the plan to escape paying for vested benefits that its employees have earned, but that the employer has not yet funded." T.I.M.E.-DC, Inc. v. ILA Local 1730 Management-Labor Funds, 756 F.2d 939, 944 (2d Cir. 1985).

The MPPAA also creates a number of exceptions to withdrawal liability. Section 1415 is one such exception, providing that where there is a "certified change of bargaining representative," the "old" multiemployer pension plan may be required to transfer its assets and liabilities to the "new" plan rather instead of receiving a withdrawal liability payment from the withdrawing employer. The Second Circuit explained the purpose of § 1415 thus:

> The term "withdrawal liability" simply is a way of describing an employer's obligation, under its collective bargaining agreement, to continue to fund the old plan to the extent that that plan remains responsible to the [transferred] employees upon their retirement. The statute further requires the old plan to reduce the employer's withdrawal liability based on the amount of assets and liabilities transferred as a result of transferred employees. In this way the statute reaches a proper allocation of the employer's payments on behalf of its

14

> employees. It ensures that both plans are funded and
> avoids the possibility of double payments by the employer.

Id. at 945-46.

In this case, the SEIU Fund remained responsible for the pension benefits that the plaintiffs' employees had earned prior to the time they were transferred. Since the assets and liabilities associated with the transferred employees remained with the SEIU Fund, the statute requires that the plaintiffs pay withdrawal liability rather than simply transferring the unfunded vested benefits to the Central States Fund. This result accords with the goals of the MPPAA: both the SEIU Fund and the Central States fund are adequately funded, and the plaintiffs are not subject to unfair "double payments." While the plaintiffs understandably would have preferred to transfer the unfunded vested benefits to the Central States Fund, thus avoiding the responsibility for immediate withdrawal liability payments, this result is in no sense absurd and cannot justify a departure from the plain meaning of the statute.

### B. Other Issues

Defendants also argue that the case should be dismissed because the plaintiffs failed to timely notify the SEIU Fund of the change in pension fund pusurant to 29 U.S.C. § 1415(b); because the trustees of the SEIU Fund have no legal existence apart from the individual trustees, and the "Trustees of the SEIU National Industry Pension Fund" is thus an improper party; and because the Central States Fund is an indispensable party under Fed. R. Civ. P. 19 but has not been joined in this action. Given the foregoing analysis, it is not necessary to reach these issues.

## V. Conclusion

For the reasons stated above, plaintiffs' motion for summary judgment is DENIED and defendants' motion for summary judgment is GRANTED. The case is DISMISSED.

SO ORDERED.

                         s/Avern Cohn
                         AVERN COHN
                         UNITED STATES DISTRICT JUDGE

Dated: February 28, 2008

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, February 28, 2008, by electronic and/or ordinary mail.

                         s/Julie Owens
                         Case Manager, (313) 234-5160